# FEBRUARY, 1904.

GULF, COLORADO & SANTA FE RAILWAY COMPANY v. THE STATE.

No. 1236. Decided February 4, 1904.

**1.—Contract—Construction—Technical Terms.**

In the absence of evidence that language employed in a writing had, by commercial usage, a different meaning, it will be construed according to the ordinary import of the words employed, in the light of attending circumstances. (P. 284.)

**2.—Question of Fact—Contract of Sale—Notice.**

A letter written on the 26th of the month, stating that: "We confirm the sale to you on 24th inst." of two carloads of grain, and promising shipment as soon as cars could be got, was not conclusive of the fact that the contract of sale testified to as made on the 24th by contract not in writing, was not complete till confirmed by such letter. (Pp. 283, 284.)

**3.—Interstate Commerce—State Regulations.**

A firm of grain dealers in Kansas City contracted with a merchant in Goldthwaite, Texas, to deliver a carload of corn at that place at a named price, having already agreed to purchase the corn to fill this sale from another dealer who had shipped it to his order from South Dakota, via Kansas City, where it was sacked and reloaded, to Texarkana, Texas; receiving the car at the latter place they had it rebilled to their order at Goldthwaite, in the same car and without breaking bulk, over connecting lines of road wholly in Texas, and delivered to their customer. Held that the shipment from Texarkana to Goldthwaite was not interstate commerce; but was subject to the regulations of the Railroad Commission of Texas, and the company became liable for charging more than the rate prescribed for such shipment from Texarkana to Goldthwaite by the State regulations. (Pp. 284-287.)

Error to the Court of Civil Appeals for the Second District, in an appeal from Tarrant County.

The State sued the railway company and recovered a judgment which was affirmed on appeal by defendant, who thereupon obtained writ of error.

*J. W. Terry* and *Chas. K. Lee*, for plaintiff in error.—The Court of Civil Appeals erred in overruling the first assignment of error of this plaintiff in error in said court, which said assignment was as follows: "The court erred in its conclusions of fact in this case in finding as follows: 'On December 26, 1901, two days after this contract for pur-

chase had been made, Hardin was informed that the corn with which the Harroun Commission Company expected to fill his order would be sacked in Kansas City, and be shipped out of Kansas City to Texarkana, but at the time of making the contract he did not know from whence the corn would come.'" Because the undisputed evidence shows that on the 26th day of December, 1901, the Harroun Commission Company wrote the Hardin Grain Company, confirming the sale made to the Hardin Grain Company on the 24th of December of the two cars of corn, reciting that the cars were to be held at the elevator of the Harroun Commission Company for sacking; and the undisputed evidence is that this letter to the Hardin Grain Company correctly stated the terms of the contract and agreement of December 24th, and shows that at the very time the Hardin Grain Company bought the corn, it knew that the corn must come from a point outside of Texas.

Transportation from a point in one State to a point in another is interstate commerce, without regard to the form of the bill of lading issued, or the number of bills of lading, or the form of the billing, or the rate of freight charges, or the fact that the line of some particular carrier is situated wholly within the State; and such shipment continues interstate commerce until it reaches and is delivered at final destination within the State. The true test is, whether the shipment, before it enters the State, is intended to go to such final destination. If so, it continues interstate commerce, although it may be stopped in transit for the purpose of transfer from one railroad to the other, or for change of ownership. State v. Gulf C. & S. F. Ry. Co., 44 S. W. Rep., 542; State v. Southern K. Ry. Co., 49 S. W. Rep., 252; The Daniel Ball, 10 Wall., 557; Houston D. Nav. Co. v. Insurance Co., 89 Texas, 1; Ex parte Koehler, 30 Fed. Rep., 867; Cutting v. Nav. Co., 46 Fed. Rep., 641; Augusta v. Wrightsville Ry. Co., 74 Fed. Rep., 523; Gulf C. & S. F. Ry. Co. v. Ft. Grain Co., 6 Texas Ct. Rep., 612.

It is not within the power or province of the Legislature of Texas or its commission to prescribe rates or charges on interstate shipments; for by the Constitution of the United States the power to regulate such commerce is vested in Congress, and any attempt for its regulation by the State would be contrary to the Constitution of the United States. Wabash Ry. Co. v. Illinois, 118 U. S., 572, and cases supra; United States v. Knight, 156 U. S., 11; Miller v. Goodman, 91 Texas, 43.

The rates prescribed by the Railroad Commission are not intended, by the act of the Texas Legislature which created the commission, to apply to interstate shipments. Missouri K. & T. Ry. Co. v. Fielder, 92 Texas, 176; Gulf W. T. & P. Ry. Co. v. Barry, 45 S. W. Rep., 814.

The corn in each shipment having been transported in the same cars in which it arrived in Texas to their final destination, Goldthwaite, Texas, did not become mingled or identified with the commerce of the State until such final delivery was made at Goldthwaite, and until such time the same remained interstate commerce, not subject to State regulation. Leisy v. Hardin, 135 U. S., 100; Miller v. Goodman, 91 Texas,

41; Lasater v. Purcell Mill and E. Co., 22 Texas Civ. App., 33; State v. Engle, 34 N. J. L., 425; State v. Carrigan, 39 N. J. L., 35.

The identical grain had been sold by the Harroun Company to the Hardin Company before it ever left Kansas City, and was likewise sold by the Hardin Company to Saylor & Burnett, of Goldthwaite, for delivery there before the movement of said grain from Kansas City began. So, when the shipment started, it was absolutely consigned to and bound for Goldthwaite, and the stoppage of the shipment at Texarkana was only to give same the color of a state shipment, and to avail of the State rate, and all the evidence shows this was and could have been the only purpose in so stopping the shipment at Texarkana, and the shipment clearly continued interstate, the subterfuge to the contrary notwithstanding. State v. Southern K. Ry. Co., 49 S. W. Rep., 252; State v. Gulf C. & S. F. Ry. Co., 44 S. W. Rep., 542.

Where, in pursuance of a contract of sale, the seller delivers the property to a carrier consigned to the seller's order, notify the purchaser, indorses the bill of lading and attaches same to a draft on the purchaser, and delivers the draft to a bank for collection, the title to the property passes to the purchaser, and the seller merely has a vendor's lien to secure payment of the draft. For these reasons, title to the corn was in the appellees long before the grain arrived at Texarkana. Ervin v. Edwards, 47 S. W. Rep., 719; Maud v. Coppinger, 23 Texas Civ. App., 128; Orcutt v. Nelson, 1 Gray, 536; Dunn v. State, 82 Ga., 27; Sarbecker v. State, 65 Wis., 171; Dolan v. Green, 110 Mass., 322; Abberger v. Marrin, 102 Mass., 70; Cleveland v. Williams, 29 Texas, 209; Kean v. Zundelowitz, 29 S. W. Rep., 930; Finch v. Mansfield, 97 Mass., 89.

Where parties in one State order goods from persons or corporations in another State, and the goods are shipped into the State, although with a draft attached and a bill of lading, the transaction is one of interstate commerce. Bateman v. Western Star Milling Co., 1 Texas Civ. App., 90; Lyons-Thomas Hardware Co. v. Reading Hardware Co., 21 S. W. Rep., 300; Zuberbier Co. v. Harris, 35 S. W. Rep., 403; Cones, etc., Mfg. Co. v. Rosenbaum, 45 S. W. Rep., 333; Gale Mfg. Co. v. Finkelstein, 22 Texas Civ. App., 241.

If the destination of these shipments before they arrived in Texas was really Goldthwaite, the mere fact of a change in ownership would not deprive them of their character as interstate shipments. A bale of cotton in transit in the hold of a vessel between Galveston and Liverpool may change ownership by indorsement of the bill of lading, but the cotton itself will remain in the hold of the ship and will still constitute foreign commerce. Missouri Pac. Ry. Co. v. Heidenheimer, 82 Texas, 195.

The undisputed evidence in this case showing, and the court having so found, that there were through interstate rates established to apply on this shipment, to which all the carriers interested were parties, and same having been published in conformity with the provisions of the

interstate commerce law, and filed with the Interstate Commerce Commission, the shipment was not only interstate commerce, but came within the express terms of the interstate commerce law, and was traffic that not only was subject to the regulations of Congress, but that in fact had been regulated by Congress, and the State had no right to undertake its regulation.

The shipment in question being clearly and unquestionably interstate commerce, any attempt by the Legislature or the Railroad Commission of Texas, or the courts of this State, to make it subject to regulation by the State of Texas or the Railroad Commission, or the laws passed by the one or regulations established by the other, is contrary to the Constitution of the United States giving Congress the exclusive right to regulate interstate commerce, and to the acts of Congress regulating such commerce, and establishing the Interstate Commerce Commission for that purpose, and are contrary to law and will not be upheld.

Penalties are assessed for wrongful and intentional violations of law. The courts will not give penal statutes oppressive construction, or enforce penalties for action taken innocently under a mistake of fact.

The railroad company, through its officers, having acted in this instance in the best of good faith, and in the belief that their obligation under the Interstate Commerce Law required the protection of the established rate, and under the belief that this was interstate commerce, even if the court should hold to the contrary, the railroad having acted honestly and innocently in the matter, it is not a proper case for the enforcement of the penalty.

The question raised by the facts in this case is: "Is a shipment of a carload of corn sold by merchants in Kansas City, Mo., to merchants at Goldthwaite, Texas, and in pursuance of such contract of sale, sacked at Kansas City and there loaded in the cars and the cars closed and sealed and started on one continuous journey to the said merchants at Goldthwaite, Texas, and thereafter carried under the original seals and delivered to them at Goldthwaite, Texas, intrastate or interstate commerce?"

To state this question would seem to be to answer it. If a transaction of this kind is not interstate commerce, it would put one seriously to thinking what could be meant by the term "interstate commerce." Yet the State in this case is insisting that this transaction, with every earmark and essential of commerce between States, shall be declared a purely State transaction. There is a good deal of evidence in this case, but the real facts may be briefly boiled down into a dialogue as follows: Hardin of Kansas City to Saylor & Burnett of Goldthwaite: "I would like to sell you some corn at so much per bushel." Saylor & Burnett to Hardin: "We will take your corn at the price named. Ship at once." Hardin to Harroun: "I have sold some corn in Goldthwaite. I want to buy some to fill the order." Harroun to Hardin: "I have some here in the elevator. I can sell you delivered f. o. b. Texarkana at so much. If you want to buy f. o. b. Goldthwaite I can

of course sell it to you, but, as you and I both know, if I don't bill it to Texarkana and sell you there, it will cost you 1½ cents per bushel more, because only by this billing can we make this appear to be a State shipment and subject to the State commission rate." Hardin to Harroun: "Why, of course, I buy f. o. b. Texarkana. Ship the grain out at once and fill my Goldthwaite order." Where has the shipment started to? To what point has it begun a continuous journey? Goldthwaite or Texarkana? Was it intrastate or interstate commerce?

It seems to us that the question involved in this case has been absolutely decided by the courts of this State in three cases, to wit: Houston D. N. Co. v. Insurance Co., 89 Texas, 1; State v. Gulf C. & S. F. Ry. Co., 44 S. W. Rep., 542; State v. Southern K. Ry. Co., 49 S. W. Rep., 252.

*C. K. Bell,* Attorney-General, for defendant in error.—Transportation from a point in one State to a point in another State constitutes interstate commerce; but when the commodity transported has reached the termination of its journey and been delivered to the consignee, it ceases to be a subject of interstate commerce, and the subsequent shipment from the point at which it has been delivered to another point in the State is an intrastate shipment. Ft. Worth & D. C. Ry. Co. v. Whitehead, 6 Texas Civ. App., 595; Cincinnati N. O. & T. P. R. R. Co. v. Interstate Com. Com., 162 U. S., 184; Chicago & N. W. Ry. Co. v. Osborne, 52 Fed. Rep., 912; Interstate Com. Com. v. Bellaire Z. & C. Ry. Co., 77 Fed. Rep., 942; Interstate Com. Com. v. Detroit, etc., Ry. Co., 167 U. S., 642; United States v. Chicago K. & S. Ry. Co., 81 Fed. Rep., 783; Gulf C. & S. F. Ry. Co. v. Miami S. S. Co., 86 Fed. Rep., 407; So. Kansas Ry. Co. v. Stump & Weaver, unreported; Missouri & I. R. R. & T. & L. Co. v. Girardhan & S. S. Ry. Co., 1 Interstate Com. Com. Reports, 30.

When the corn arrived at Texarkana and was delivered to the consignee it became a part of the property situated within the State of Texas and subject to the laws of this State. The corn was delivered to the Hardin Grain Company on the 13th day of January, 1902, and on that date shipped by them over the road of the Texas & Pacific Railway Company. The proposition is in no way attempted to be controverted that property passing through a State on its shipment continues · to be interstate commerce even if the shipment should suffer temporary stoppage, but when the commodity reaches its termination according to the contract under which it was shipped and comes to a stop for a new shipment or for such other uses as the shipper may see proper to make of it, then it has lost its character as a commodity of interstate commerce; and especially is this the case where the ownership of the goods has undergone a change after the termination of the original shipment into the State. Norfolk Ry. Co. v. Commonwealth, 93. Va., 749; Prentice & Egan, Com. Clause of the Constitution, 275.

The fact that the officers of the defendant corporation may have been

honestly mistaken as to their rights was evidently considered by the court in fixing the penalty, which was assessed at the lowest amount authorized; but this is the full extent to which that matter could be considered. Rev. Stats., art. 4573.

When commodities have been transported from a point without the limits of a State to a point within the State, to which under the contract of shipment they were to be transported and the contract of shipment complied with and ended, such commodities have ceased to be articles of interstate commerce, and are thereafter in all respects subject to the laws of the State in which they may be, and this although the shipper may have intended from the beginning that they were to be immediately taken to some place within the State other than that to which the carrier had contracted to convey them. The motives of an importer can not be looked to for the purpose of causing commodities to continue subject of interstate commerce which would have ceased to be such but for such motives. Whatever may have been the motives which prompted it, the shipment of corn from without the State terminated at Texarkana. A new contract for the shipment of the corn from that place to Goldthwaite was made, and it was on account of the overcharge on this last shipment that this suit was brought.

It must be confessed that the decision of the Court of Civil Appeals in the case of the State of Texas v. Southern Kansas Railway Company, 49 S. W. Rep., 452, is directly in conflict with the contention presented in this brief; but in the case where the shippers, Stump & Weaver, sued the railway company on the identical facts which were presented in the case referred to, this court took exactly the opposite view of the law applicable to them as did the Court of Civil Appeals which rendered the decision in the case just mentioned, and the judgment of the lower court against the railway company was affirmed.

GAINES, Chief Justice.—This suit was brought by the State of Texas to recover of the Gulf, Colorado & Santa Fe Railway Company a penalty of $5000 for demanding and receiving for transporting a carload of corn from Texarkana, Texas, to Goldthwaite, Texas, a greater compensation than that allowed and fixed by the Railroad Commission of Texas for such service. The case was tried without a jury and a judgment was entered in the trial court for the sum of $100. Upon appeal to the Court of Civil Appeals the judgment was affirmed.

The trial judge filed his findings of fact, which are as follows:

"1.   The Railroad Commission of Texas, after due notice of the time and place where the rates would be fixed by it, fixed and established the rates which might be charged by a railroad or by two or more lines of railroad, whether under the same management and control or not, for the transportation of corn, between points within the State of Texas, in carload lots, at 12½ cents per one hundred pounds for a distance of over 165 miles, which rate became effective on March 10, 1899, and remained effective until the present time, of which action the defendant and the

Texas & Pacific Railway Company received legal notice before the rates prescribed became effective.

"2. The distance from Texarkana, Texas, to Goldthwaite, Texas, over the Texas & Pacific Railway to Fort Worth and from Fort Worth over the G. C. & S. F. Railway to Goldthwaite, Texas, is more than 165 miles.

"3. The Texas & Pacific Railway Company owns and operates a railroad from Texarkana, Texas, to Fort Worth, Texas, and the defendant from Fort Worth, Texas, to Goldthwaite, Texas, and each of these points and all intermediate points on each of said roads are entirely within the State of Texas.

"4. The Texas & Pacific Railway Company executed a bill of lading dated Texarkana, Texas, January 13, 1902, which bill of lading purported to acknowledge the receipt from the Samuel Hardin Grain Company at Texarkana, Texas, of one car of sacked corn, same being car 3845 P. & G., and which bill of lading purported to show that the said corn was consigned to shippers order notify Saylor & Burnett, Goldthwaite, Texas.

"5. Said carload of corn was transported by the Texas & Pacific Railway Company to Fort Worth and there delivered to the defendant, and was by it received and transported to Goldthwaite, Texas, where it arrived on the 17th day of January, 1902, and Saylor & Burnett, who were acting for Samuel Hardin Grain Company, tendered to the defendant's agent at Goldthwaite $82.50 in payment of the freight charges thereon; the said agent declined to accept said amount of $82.50 in payment of said charges, and demanded $165 for the transportation of said carload of corn from Texarkana, Texas, to Goldthwaite, Texas.

"6. The agent of the defendant at Goldthwaite, Texas, charged, collected, demanded and received from Samuel Hardin Grain Company $165 for the transportation of said carload of 66,000 pounds of corn from Texarkana, Texas, to Goldthwaite, Texas; in so charging, collecting, demanding and receiving said $165 the said agent of the defendant was acting under instructions from the executive officers and attorneys of the defendant company, who believed and advised that said shipment was interstate commerce, and his action in so doing was subsequently ratified by the defendant.

"7. The Samuel Hardin Grain Company made complaint to the Railroad Commission of Texas of the action of the defendant in charging more than 12½ cents per hundred pounds for transporting said corn, whereupon the Railroad Commission investigated such complaint and ordered this suit to be instituted, in accordance with the provisions of article 4568 of the Revised Statutes of Texas.

"8. On December 23, 1901, the Samuel Hardin Grain Company at Kansas City, Mo., offered to sell Saylor & Burnett at Goldthwaite, Texas, No. 2 mixed corn at 86½ cents per bushel for delivery on railway track at Goldthwaite, and this offer was accepted for two carloads of corn. This offer and acceptance was by telegraphic communication

between the parties at their respective places of business.  The Hardin Grain Company did not at that time have the corn, but on December 24, 1901, to fill the order it contracted with the Harroun Commission Company at Kansas City for the purchase of two 66,000 pound cars No. 2 mixed corn at 75½ cents per bushel to be delivered at Texarkana, Texas, to the Hardin Grain Company.  Previously to this the Harroun Commission Company had contracted for the purchase of two cars of corn to be delivered to it at Texarkana, Texas, and with these two cars it expected to and did fill the order of the Hardin Grain Company.  These cars had originated at Hudson, S. D.  The receiving carrier at Hudson was the Chicago, Milwaukee & St. Paul Railway Company, who issued bills of lading limiting its liability to losses occurring on its road with a like limitation of liability of all other carriers who should handle said corn in transit to its destination.  By the terms of said bills of lading the corn was consigned to 'Forrester Bros., Texarkana, Texas,' and shipment made in cars of C. M. & St. P. Ry. Co., care of Kansas City Southern Ry. at Kansas City, Mo., with the privilege to stop the corn at Kansas City for inspection and transfer.  The corn reached Kansas City on December 17, 1901, was there unloaded, sacked and transferred to the Kansas City Southern Railway Co., who on December 31, 1901, issued bills of lading reciting that the corn was loaded in cars No. 3845, P. G. and No. 4189 P. O.; that same was received of Forrester Bros. and consigned as follows, 'Shippers order notify Harroun Commission Company, Texarkana, Texas,' and reciting further that freight 14 cents per hundred lbs. was prepaid, and one of these cars, to wit, car 'No. 3845 P. G.,' is the car in controversy in this suit.

"9.  The Harroun Commission Co. paid no freight on the corn from Hudson, S. D., to Texarkana, Texas, as it had purchased it to be delivered at Texarkana.

"10.  The freight on the corn from Hudson to Texarkana was as follows: 18 cents per 100 lbs. from Hudson to Kansas City and 14 cents from Kansas City to Texarkana, all of which was paid by the venders of Harroun Commission Company.  The minimum interstate rate from Hudson, South Dakota, to Goldthwaite, Texas, was 46 cents per 100 lbs., which would have been apportioned as follows: 18 cents from Hudson to Kansas City and 28 cents from Kansas City to Goldthwaite, Texas.  The G. C. & S. F. Ry. Co., the T. & P. Ry. Co. and the Kansas City Southern Ry. Co., together with other connecting lines from Kansas City, Mo., to Goldthwaite, Texas, had established a joint tariff of 35 cents per 100 lbs. on shipments from Kansas City to Goldthwaite via Texarkana and originating in Kansas City, had agreed on a division of that rate between them and had filed tariffs establishing such rate with the Interstate Commerce Commission, and by such steps had brought themselves within the provisions of the interstate commerce laws.

"11.  The Hardin Grain Company's officers kept themselves informed of interstate commission freight rates and of the State commission rates, and the reason why they contracted for the corn to be delivered

to them at Texarkana was because they could fill their contract with Saylor & Burnett at Goldthwaite at about 1½ cents per bushel cheaper than they could if they had bought the corn for delivery to them at Kansas City and had shipped from Kansas City to Goldthwaite.

"12. At the time of the purchase contract between the Hardin Grain Company and the Harroun Commission Company, Hardin, the manager of the former company, intended that the corn to be thereby acquired should go to Saylor & Burnett and should be shipped to Goldthwaite, from Texarkana, as soon as practicable, and on December 26, 1901, two days after this contract for purchase had been made, Hardin was informed that the corn with which Harroun Commission Company expected to fill his order would be sacked at Kansas City and be shipped out of Kansas City to Texarkana, but at the time of making the contract he did not know from whence the corn would come.

"13. On December 31, 1901, the date of shipment from Kansas City to Texarkana, Harroun Commission Co. informed the Hardin Grain Co. that the corn to fill the latter order had been loaded to start to Texarkana, and requested instruction as to how the corn should be shipped from Texarkana for the guidance of F. L. Adkins, their agent at that place, who would attend to such reshipping for the Hardin Grain Company as per former understanding. Thereupon, and in compliance with such request, blank bills of lading were made out by the Hardin Grain Company in Kansas City and furnished to the Harroun Commission Company to be forwarded to F. L. Adkins. These bills of lading were to be executed by the Texas & Pacific Railway Company and F. L. Adkins as agent for the Hardin Grain Company, and were for shipment of the corn to Goldthwaite, Texas, consigned to 'Shippers order notify,' etc., giving the numbers and initials of cars, which information had been furnished by the Harroun Commission Company and on January 14, 1902, the reshipment having been made as per instructions, the bills of lading duly executed by the Texas & Pacific Ry. Co. were by Harroun delivered to Hardin Grain Co., who thereupon paid the Harroun Commission Company $1779.64, the purchase price previously agreed upon for the corn, and the receipt of said blank bills of lading by the Harroun Commission Company was the first information had by that company of the intended final destination and disposition of the corn.

"14. Neither Hardin Grain Co. nor Harroun Commission Co. had any store or warehouse at Texarkana, but under the agreement between the two companies (Hardin and Harroun), one F. L. Adkins, who was the agent of the Harroun Commission Co., and stationed at Texarkana, reshipped the corn at Texarkana for the Hardin Grain Company. That shipment was to Goldthwaite, Texas, over the Texas & Pacific Ry. Co. and the G. C. & S. F. Ry. Co. by bill of lading reciting its receipt from Hardin Grain Co., and consigned to 'Shippers order notify Saylor & Burnett, Goldthwaite, Texas,' and was transferred under original seals and without breaking packages, to the Texas & Pacific Ry. Co., after having remained at Texarkana five days; the only thing done by F. L.

Adkins was to surrender the Kansas City Southern bill of lading, have the cars set over on the T. & P. Ry. and take a bill of lading from the latter company. The corn reached Texarkana January 7, 1902, and was, shipped out from Texarkana January 13, 1902. The defendant was not a party to the bill of lading executed at Texarkana.

"15. On December 31st, 1901, Hardin Grain Co. mailed to Saylor & Burnett an invoice of the corn, in the form of an account stating the car numbers and initial, the amount of corn, and price to be paid by Saylor & Burnett."

The findings of fact were assailed in the Court of Civil Appeals in one particular only. It was assigned as error in that court, and is also assigned in this court, that the trial judge erred in concluding that: "On December 26, 1901, two days after this contract for purchase had been made, Hardin was informed that the corn with which Harroun Commission Company expected to fill his order would be sacked in Kansas City, and be shipped out of Kansas City to Texarkana, but at the time of making the contract he did not know from whence the corn would come."

It is insisted that the finding is contrary to the undisputed evidence adduced upon the trial. The question so presented, if it have a material bearing upon the decision of the case, lies at its very threshhold and is the first for our determination. But we do not concur in the proposition that the finding is not supported by the evidence. The contention of counsel for the plaintiff in error seems to be based upon the theory that the sale by the Harroun Commission Company to the Hardin Grain Company was only completed by the letter of the former to the latter, which was written on December 26, 1901. The following is a copy of that letter: "We confirm sale to you on 24th inst. of two 66,000 pound cars of bulk No. 2 mixed corn at 75½c per bus., delivered at Texarkana our weights and grades shipment as quickly as we can get cars. Cars to be held at our elavator for sacking." Now there is nothing in the testimony as to the purpose of this letter. Samuel Hardin of the Hardin Grain Company testified in his first deposition, which was taken and read in evidence on behalf of the defendant corporation: "It is a fact that I bought the two cars of corn to fill this order from the Harroun Commission Company on the 24th day of December, 1901." The letter indicated that this was true. The words "sale to you on the 24th inst.," tend at least to show that the sale had been made on the day mentioned. What meaning was intended to be conveyed by the word "confirm" is not so clear. It may be that an agreement had been entered into by the parties, in which the terms of the sale had been agreed upon, but which left the offer subject to the acceptance of the seller, dependent upon some contingency. Or it may be that the contract for the sale of the corn had been completed on the 24th of December and that the purpose of the letter was merely to advise the purchasers as to the probable time of the delivery. It is probable that the letter may be of a form in use among dealers in grain and other commodities sold in

like manner; and that the language employed, according to commercial usage, had a meaning different from that which it imports in common parlance. But we find in the record no testimony as to any special meaning attached to the terms as ordinarily used by dealers in making transactions of the character of that under consideration. The letter must therefore be construed according to the ordinary import of the words employed and in the light of the circumstances attending the transaction; and so construed we are of opinion that it does not show beyond dispute that the contract for the sale of the corn was not made before the letter was written. It is true that Hardin, in his testimony, speaks of the letter as confirming the sale, and it may be that the agreement was made subject to the confirmation of the Harroun Commission Company. But we think this would make no difference, since, upon the confirmation, the Harroun Commission Company were bound by the contract as originally made. It follows therefore, as we think, that, in the determination of the case, the letter is entitled to no weight except in so far as it shows that, before the corn was delivered at Texarkana, the Hardin Grain Company were apprised that it would be shipped from the State of Missouri into the State of Texas. Since we approve the finding of the trial court and of the Court of Civil Appeals to the effect that when the Hardin Grain Company made the contract for the purchase of the corn, they did not know from what point it would be shipped, it is unnecessary for us to pass upon the question whether it would have altered the case had they known the fact.

This brings us to the main question in the case. The substance of the facts as found by the trial court and the Court of Civil Appeals seems to us to be these: The Hardin Grain Company, doing business in Kansas City, Missouri, having made a contract with parties at Goldthwaite, Texas, for the delivery of two carloads of corn at that place, in order to comply with their undertaking, contracted to purchase of Harroun Commisson Company, who were also doing business at Kansas City, Missouri, and had an agent at Texarkana, Texas, the same quantity of corn, to be delivered at the point last named; that the corn with which the Harroun Commission Company proposed to fulfill their contract was shipped from South Dakota to Texarkana, Texas, through Kansas City, Missouri; that while it was in transit at the latter place, the Harroun Commission Company became apprised of that fact; that the corn was delivered at Texarkana, Texas, in accordance with the agreement to the Hardin Grain Company, who thereupon shipped it in the same cars, without breaking bulk, over the Texas & Pacific Railway and its connecting lines to Goldthwaite, Texas.

The question then is: Was the transportation of the corn from Texarkana to Goldthwaite such a shipment within the State of Texas as to be deemed a carriage subject to the control and regulation of the Railroad Commission in this State? If that question be answered in the affirmative, then the judgment in this case should be affirmed; if in the negative, it should be reversed. Since the contract of the Hardin Grain

Company with the initial carrier at Texarkana was a contract for transportation wholly within this State, the question resolves itself into the inquiry whether the facts just stated change the character of the transportation and make the carriage from Texarkana to Goldthwaite a part of an interstate shipment.

We are of opinion, that, as applied to the matter to be determined in this case, the carriage of the corn from Texarkana to Goldthwaite should be deemed independent of and wholly disconnected from its transportation to Texas from South Dakota, or Kansas City. The nearest approach to a decision of this question by this court is found in the following cases: Houston Direct Navigation Co. v. Insurance Co., 89 Texas, 1; Fuqua v. Brewing Co., 90 Texas, 298; State v. Railway Co., 44 S. W. Rep., 542. In the case last named the opinion is by the Court of Civil Appeals, but a writ of error was refused by this court. In the case first mentioned certain bales of cotton were delivered at Houston, Texas, to the navigation company for transportation to Galveston, in the same State, and the bill of lading contained this stipulation: "It is understood and expressly stipulated that the liability of the Houston Direct Navigation Company shall cease upon delivery to the next connecting line, and that the said Houston Direct Navigation Company and its connections, which receive and transport the said property, shall not be liable for loss by fire," etc. The evidence showed that the cotton was the property of foreign buyers to whom it was consigned, and that the consignors contemplated an immediate and continuous shipment to foreign ports. The cotton was destroyed by fire before it was delivered by the navigation company to the connecting line, and the question was as to its liability for the loss. It was held that the shipment throughout was a foreign shipment and that the statutes of this State which prohibited common carriers, contracting for a carriage wholly within this State, from limiting their liability at common law did not apply. In the Fuqua case "the parties contracted for the sale and purchase of beer to be transported from Milwaukee to Amarillo, to be there delivered to Kingsbury and become his property;" and it was held, that as soon as the beer was delivered to Kingsbury it became a "part of the common mass of property within a State," and was "subject to its unimpeded control." In the case of State v. Railway Co., supra, the shipment was from San Angelo, Texas, to Fort Worth in the same State; but the trial court found as a fact that the purpose of the initial shipment was to transport the property to a point beyond the limits of the State and the Court of Civil Appeals sustained this finding. It was held that this was an interstate shipment and that therefore it was not subject to the regulation of the Railroad Commission of Texas. Upon the trial there was an attempt to show that the purpose of the shippers was to ship the property in controversy to Fort Worth for sale at that point, and that the further carriage to Kansas City was contemplated only in the event of their failure to make a sale. If the State had succeeded in establishing this fact, the case would have been brought within the rule

applied in Coe v. Errol, 116 U. S., 517, that goods in transit do not cease to be subject to the jurisdiction of a State, "until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey."

But such is not the case before us. Here the Harroun Commission Company, the original consignors, were the owners of the corn .when shipped and until its arrival at Texarkana and delivery there to the Hardin Grain Company in compliance with their contract for its sale. They neither intended nor contemplated any shipment beyond the point to which it was consigned. When the corn was delivered to them at Texarkana, the contract on part of the carriers was performed and the carriage so far was at an end. Even had they known that the buyers intended to have the corn transported to a further point in Texas, we fail to see that it would have altered the case. Having ceased to be the owners of the corn upon its delivery to the Hardin Grain Company at Texarkana, as contemplated in their contract, they had no further control over it nor had they any further concern with it.

As to the point of time at which articles of commerce which have been transported from one State into another cease to be subject to the commerce clause of the Constitution of the United States, the Supreme Court of the United States distinctly held that they are exempt from regulation by the State into which they are carried until they are delivered to the consignee, and that, if they are imported for the purpose of sale, not then until they are sold, provided they are kept in the original packages. Welton v. Missouri, 91 U. S., 276; Leisy v. Hardin, 135 U. S., 100; Emert v. Missouri, 156 U. S., 296; Waring v. The Mayor, 8 Wall., 110; Pervear v. Commonwealth, 5 Wall., 475. In the case last cited the court say: "Merchandise in original packages, once sold by the importer, is taxable as other property." If taxable it is because it has become exempt from the operation of the commerce clause of the Constitution of the United States and fallen under the control of the State.

Nor do we think the case of the plaintiff in error presents any better aspect when viewed from the standpoint of the Hardin Grain Company. They were not the agents of the Harroun Commission Company, nor were the latter their agents. The relation between the two was merely that of buyers and sellers. The only circumstance which tends to show that the carriage from Texarkana to Goldthwaite was a part of an interstate transportation is the mere fact of its continuity. Immediately upon their receipt of the cars of corn the purchasers, the Hardin Grain Company, caused them to be transferred to the tracks of the Texas & Pacific Railway Company and consigned them to Goldthwaite. But as we apprehend this makes no difference. It was no concern of the purchasers whether the corn which was delivered to them came from Texas or from another State. Nor was it a matter of any moment to the sellers what was done with it after its delivery. The instant the prop-

erty was delivered and the sale completed, according to the authorities cited, it became a part of the common mass of property subject to the laws of Texas and its further transportation within the State was a matter for State regulation.

It follows, that in our opinion the judgment of the District Court and that of the Court of Civil Appeals should be affirmed, and it is accordingly so ordered.

*Affirmed.*